Chemclene Corporation et al., Petitioners *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued June 5, 1985, before President Judge CRUMLISH, JR., and Judges ROGERS, CRAIG, MACPHAIL, BARRY, COLINS and PALLADINO.

*Marc E. Gold,* with him, *Robert B. McKinstry, Jr., Wolf, Block, Schorr and Solis-Cohen,* for petitioners.

*Timothy Bergere,* with him, *Louis A. Naugle* and *Michele Straube,* Assistant Counsels, and *Peter Shelley,* of Counsel, for respondent.

OPINION BY JUDGE ROGERS, August 22, 1985:

Chemclene Corporation, Tonawanda Transport Service, Inc., Frontier Chemical Waste Process, Inc., and South Jersey Pollution Control, Inc. (appellants), are engaged in the business of transporting hazardous waste in interstate commerce. They have filed a petition for review of an adjudication of the Environmental Hearing Board (board): (1) dismissing their three constitutional challenges to Section 505(e) of the Solid Waste Management Act (SWMA), Act of July 7, 1980, P.L. 380, 35 P.S. §6018.505(e), which requires that transporters of hazardous waste file a collateral bond with the Department of Environmental Resources (DER) as a condition for obtaining state hazardous waste transportation licenses; and (2) dismissing their contention that DER's procedures for fixing the amounts of such bonds were void for having been promulgated without compliance with the Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§1102-1208, commonly known as the Commonwealth Documents Law (CDL).

The SWMA provides, *inter alia,* that no person or municipality shall transport hazardous waste within the Commonwealth without first obtaining a license from DER. Section 505(e) provides, in part, that:

Prior to the issuance of any license for the transportation of hazardous waste, the applicant . . . shall file with the department of collateral bond on a form prescribed and furnished by the department. Such bond shall be payable to the Commonwealth and conditioned upon compliance by the licensee with every require-

ment of this act, rule and regulation of the department, order of the department and term and condition of the license. The amount of the bond required shall be in an amount determined by the secretary, but in an amount no less than $10,000. The department may require additional bond amounts if the department determines such additional amounts are necessary to guarantee compliance with this act. The licensee may elect to deposit cash or automatically renewable irrevocable letters of credit . . . or negotiable bonds of the United States. . . . No corporate surety bond is authorized by this subsection.

In the Fall of 1980, DER notified each of the appellants of the amount of the collateral bond it was to file with its application for license. The amount of the bond of each applicant was to be determined by reference to a matrix and bond table developed by DER. The appellants filed appeals from this action with the board alleging: (1) that Section 505(e) of the SWMA was unconstitutional; (2) that DER's bond assessment procedures had not been promulgated as provided by the CDL; and (3) that the amounts of their individual bonds were too high. It was agreed by the parties that the appeals would be consolidated and the proceedings bifurcated with the board first deciding the common legal issues, the constitutionality of the Section 505(e) bond requirement and the validity of DER's bond assessment procedures, based upon briefs and a stipulated record and that then, if a transporter desired, the board would hear argument concerning the amount of that bond. The board determined that it was without power to decide the question of the constitutionality of the bond requirement; and it held that DER's bond assessment procedures

were valid because they were not required to be promulgated in the manner prescribed by the CDL. The appellants withdrew their complaints concerning the amounts of their bonds. The board thereupon entered an order dismissing the appeals.

## Constitutional Issues

The appellants contend that Section 505(e) of the SWMA is unconstitutional because: (1) the regulation of hazardous waste transportation, including the requirement that a bond for compliance with state law be filed, has been preempted by federal law; (2) that Section 505(e) imposes an undue burden on interstate commerce; and (3) that Section 505(e) denies transporters of hazardous waste the equal protection of the laws because by Section 505(a) of SWMA, owners of hazardous waste treatment, storage and disposal facilities may file bonds with corporate sureties and are not required to post collateral.

## Preemption

The appellants advance two arguments in support of their preemption theory: (1) that the Section 505(e) bond requirement has been expressly preempted by Section 114 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §9614, and (2) that any state compliance bond requirement has been preempted by the pervasive nature of federal statutes and regulations in the field of hazardous waste transportation.

Where a state's exercise of its police powers is challenged as subversive of Article VI, Section 2, the so-called supremacy clause of the United States Constitution, "we start with the assumption that the historic police powers of the States were not to be super-

seded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). However, when Congress has unmistakably ordained that its enactments alone were intended to regulate a part of commerce, either by express statutory command, *Jones v. Rath Packing Co.*, 430 U. S. 519 (1977), or by implicit legislative design, *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973), state laws regulating that aspect of commerce must fall. State laws may be thus preempted because of square conflict with particular provisions of federal law or because of general incompatibility with basic federal objectives as evidenced by federal statutes and regulations. *See Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978).

The appellants contend that the collateral bond requirement of Section 505(e) of the SWMA, 35 P.S. §6018.505(e), is expressly preempted by Section 114 (d) of CERCLA, 42 U.S.C. §9614(d), which reads, in part, as follows:

Relationship to other law

. . . .

Except as provided in this title, no owner or operator of a vessel or facility who establishes and maintains evidence of financial responsibility in accordance with this title shall be required under any State or local law, rule or regulation to establish or maintain any other evidence of financial responsibility in connection with liability for the release of a hazardous substance from such vessel or facility.

Section 108 of CERCLA, 42 U.S.C. §9608, in turn, provides that financial requirements with respect to transporters of hazardous waste are to be determined under Section 30 of the Motor Carrier Act of 1980 (MCA), 49 U.S.C. §10927. Section 30 of the MCA

establishes minimum levels of financial responsibility depending upon the type of hazardous material to be transported and the size of the vehicle.

The appellants argue that the Section 505(e) collateral bond requirement constitutes "evidence of financial responsibility in connection with liability for the release of a hazardous substance" within the meaning of Section 114(d) of CERCLA, and is therefore preempted by federal law. We disagree. There is no evidence that Congress had, in the words of *Rice v. Sante Fe Elevator Corp.*, "a clear and manifest purpose" to preempt state regulation of the transportation of hazardous waste. To the contrary, Section 114(a) of CERCLA, reproduced below, contains a broad disclaimer of preemptive intent:

> Nothing in this Act shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State.

Moreover, CERCLA, the MCA and the SWMA do not address the same subject matters. CERCLA was enacted by Congress in 1980 "to provide for liability, compensation, clean up, and emergency response for hazardous substances released into the environment, and the clean up of inactive hazardous waste disposal sites." Preamble to CERCLA, Pub. L. No. 65-510, 94 Stat. 2767. Although the term "financial responsibility" is not defined in CERCLA, regulations at 49 C.F.R. §387.5 define that term as "the financial reserves . . . sufficient to satisfy liability amounts set forth in this part covering public liability." The "public liability" for which transporters must maintain evidence of financial responsibility is limited solely to an unexpected and unintentional "discharge, dispersal, release or escape into [the environment] of

any commodity transported by a motor carrier." 49 C.F.R. §387.5. Thus, the term "financial responsibility" as used in Section 114(d) of CERCLA contemplates an insurance program designed to pay the costs of cleaning up accidental spills of hazardous waste or hazardous materials and the claims resulting therefrom. In contrast, the bond required by Section 505 (e) of the SWMA is a compliance bond. Its purpose is to insure the performance by a transporter of hazardous waste of all the obligations imposed by the SWMA, rules and regulations promulgated by DER, and the terms and conditions of the license; it is not intended to cover costs incurred by an accidental discharge of hazardous waste. The Section 505(e) bond is intended to discourage actions and events which are not covered by insurance, such as intentional and willful violations of the laws and regulations concerning the transportation of hazardous waste whether or not injury is done. Unlike the financial responsibility embodied in Section 114(d) of CERCLA, forfeiture of a Section 505(e) bond is not dependent upon proof of loss or damage, but rather on proof of a licensee's violation of the provisions of the SWMA and the rules and regulations promulgated thereunder.

The appellants next argue that the Section 505(e) bond requirement has been impliedly preempted by the pervasive nature of federal statutes and regulations concerning the transportation of hazardous waste and hazardous materials. The appellants cite CERCLA and the MCA financial responsibility requirements; the Hazardous Materials Transportation Act (HMTA), 49 U.S.C. §§1801-1813; and the Resource Conservation Recovery Act (RCRA), 42 U.S.C. §§6901-6907, and contend that federal regulation of the field is complete and has left no room for states to

supplement it. An examination of the federal statutes has not persuaded us to this conclusion.

In addition to the disclaimer of preemptive intent in Section 114(a), CERCLA provides for state participation in the management, containment and clean-up of releases of hazardous materials. Section 104 of CERCLA, 42 U.S.C. §9604, provides that the federal authorities must consult with affected states before taking remedial action with respect to the clean-up of hazardous waste spills; it requires state participation in clean-up as prerequisite to receiving federal funds; and it encourages states to become the official response authorities if they have the technical capabilities. Moreover, Section 104 of CERCLA authorizes the President to enter into cooperative agreements or contracts with the states or their political subdivisions to expedite remedial actions.

Neither the HMTA nor RCRA manifest such "federal superintendence of the field," *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142 (1963), as to cause Section 505(e) to fail by implication. Although the HMTA does indeed impose detailed and complex safety requirements on transporters of hazardous waste transportation, the scope of the act in this regard is narrow, devoted principally to matters of labeling, packaging standards, testing procedures, and training and safety practices. Moreover, Section 112(a) of the HMTA, 49 U.S.C. §1811(a), preempts only state statutes which are inconsistent with its provisions and even inconsistent state regulations will not be preempted if, after an inconsistency review by the federal Department of Transportation, they are granted an exemption. *See* 49 U.S.C. §1811 (b).

The appellants' characterization of the RCRA as a pervasive federal regulation aimed at occupying the

field of hazardous waste is contrary to the express language of the RCRA itself. The RCRA provides that states, and not the federal government, have the primary responsibility to control the management of solid waste. 42 U.S.C. §6901(a)(4). Indeed, the United States Supreme Court, when faced with a similar argument held, "[f]rom our review of [the RCRA], we find no 'clear and manifest purpose of Congress' to preempt the entire field of interstate waste management or transportation. . . ." *Philadelphia v. New Jersey,* 437 U.S. 617, 620-621 n.4 (1978) (citations omitted).

The appellants rely heavily on the case of *City of Burbank v. Lockheed Air Terminal, Inc.,* 441 U.S. 624 (1973), where the United States Supreme Court struck down as preempted a municipal ordinance attempting to regulate the noise of aircraft at a nearby airport. "It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is preemption." *Id.* at 633. The facts of *Burbank* are distinguishable. In *Burbank,* aircraft noise, the subject of the local regulation, was found to be inextricably tied to an area of "complete and exclusive national sovereignty in the airspace of the United States." *Id.* at 626-627. Moreover, as the Supreme Court observed, "[t]he aircraft and its noise are indivisible; the noise of the aircraft extends outward from it with the same inseparability as its wings and tail assembly; to exclude the aircraft noise from the Town is to exclude the aircraft. . . ." *Id.* at 628 (quoting *American Airlines v. Hempstead,* 272 F. Supp. 226, 230 (E.D.N.Y. 1967), *aff'd,* 398 F.2d 369 (2nd Cir. 1968)). The Court also noted that Congress had given the Federal Aviation Administration and the Environmental Protection Agency the power to develop noise regulations consistent with air safety

and concluded that "[t]he interdependence of these factors [noise, safety, and efficiency] requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled." *Id.* at 639. Also, as the Supreme Court observed, the Federal Aviation Act declared that the United States government possesses and exercises "complete and exclusive national sovereignty in the airspace of the United States," language not found in any of the Acts cited by the appellants with respect to the transportation of hazardous waste. The evident intent of Congress in each of those statutes is to interject a federal presence but to allow states to establish enforcement programs suitable to their own interests.

### The Commerce Clause

The appellants contend that the Section 505(e) compliance bond requirement impermissibly burdens interstate commerce and is therefore violative of the Commerce Clause.

The Commerce Clause, set forth in Article I, §8 of the United States Constitution, is phrased as an affirmative grant of power to Congress: "The Congress shall have power . . . to regulate commerce with foreign nations, and among the several States. . . ." Once Congress acts pursuant to this power, its preemptive effect is established. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1 (1824). It is only when Congress has not acted that the issue of state power arises. Although the Commerce Clause does not explicitly limit state interference with interstate commerce, it is settled that even in the absence of a Congressional exercise of this power, the Commerce Clause "prevents the States from erecting barriers to the free flow of interstate

commerce." *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 440 (1978).

Where, as here, a state's attempt to regulate in the field of health and safety allegedly creates an impact on interstate commerce, we must balance the purpose to be served by the regulation against the type and the force of its impact on interstate commerce. *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662 (1981); *Raymond Motor Transportation, Inc. v. Rice; Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970); *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440 (1960). "Under that general rule we must inquire (1) whether the challenged statute regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce." *Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979).

The Supreme Court has emphasized that the Commerce Clause should be cautiously applied to invalidate state regulation. "In no field has this deference to state regulation been greater than that of highway safety regulation." *Raymond Motor Transportation, Inc.,* 434 U.S. at 443. Those who challenge state regulations intended "to promote highway safety must overcome a 'strong presumption of their validity.' " *Id.* at 444 (quoting *Bibb v. Navajo Freight Lines,* 359 U.S. 520, 524 (1959)). The appellants have not met their burden of overcoming these concerns and obstacles.

The Section 505(e) bonding requirement does not discriminate against interstate commerce either on its face or in practical effect; it applies evenhandedly to

*all* transporters of hazardous wastes, both in-state and out-of-state, "which are generated, stored, treated or disposed of within the Commonwealth." 25 Pa. Code §75.263.(a)(1). It is not disproportionately burdensome on out-of-state residents nor does it secure benefits for residents of the Commonwealth while shifting to neighboring states the costs and risks associated with the transportation of hazardous waste. *Compare Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662 (1981) (U.S. Supreme Court struck down an Iowa statute which restricted the size of trucks but which contained several exemptions favorable to Iowa residents). Moreover, since the bonding requirement does not apply to transporters of hazardous waste merely passing through the Commonwealth of Pennsylvania, 25 Pa. Code §75.263(a)(1), it cannot be said to be "protectionist" in nature. *See Kassel; Philadelphia v. New Jersey*, 437 U.S. 617 (1978) (U.S. Supreme Court struck down a New Jersey statute which prohibited the transportation of out-of-state waste into New Jersey for disposal); and *Browning-Ferris, Inc. v. Anne Arundel County*, 292 Md. 136, 438 A.2d 269 (1981) (Md. Court of Appeals invalidated a county ordinance which prohibited the transportation of hazardous waste through the county).

The appellants have adduced no evidence that the Section 505(e) bonding requirement imposes anything more than an incidental burden on interstate commerce or that the safety benefits derived from the requirement are trivial.

The appellants argue in their brief that "the collateral bond requirement is likely to have . . . a substantial inhibiting effect on interstate commerce by deterring out-of-state transporters from conducting business in Pennsylvania" and that if all the other states and the District of Columbia were to implement

similar bond requirements the "interstate movement of hazardous waste would be forced to cease." These arguments not only ignore the fact that the Section 505(e) bond requirement does not apply to persons or businesses merely transporting hazardous waste through Pennsylvania but they are also unsupported by record evidence.

## Equal Protection

The appellants contend that the bond requirement of Section 505(e) of the SWMA is unconstitutional in that it denies them equal protection under the laws. Their thesis is that by allowing owners of hazardous waste, treatment, storage and disposal facilities to post surety bonds while requiring transporters of hazardous waste to post collateral bonds, the Legislature has arbitrarily and capriciously violated their rights to equal protection of the laws. This argument is entirely without merit.

The equal protection clause of the Fourteenth Amendment does not deny the state the power to treat different classes of persons in different ways; it merely requires that where a classification is made it must be reasonable and not arbitrary. The classification must be based on some ground or difference having a fair and substantial relationship to the object of the legislation so that all persons similarly circumstanced will be treated alike. *Reynolds v. Sims,* 377 U.S. 533 (1964).

Enterprises which transport hazardous waste and those which own hazardous waste, treatment, storage and disposal facilities are not "similarly circumstanced." For example, vehicles transporting hazardous waste are inherently mobile, not readily subject to administrative inspection, and may be operated by persons or entitites not having a terminal or prop-

erty within the Commonwealth. Owners of hazardous waste, treatment, storage and disposal facilities, on the other hand, are not engaged in transporting waste over the roads of the Commonwealth. Their facilities are capital intensive and are readily subject to inspection.

Thus, the Legislature's requirement that transporters of hazardous waste post a collateral bond is not rendered unconstitutional merely because only surety bonds are required of owners of hazardous waste, treatment, storage and disposal facilities.

### DER's Bond Assessment Procedures

The appellants contend that DER's use of two unpublished, in-house documents for determining the amounts of their individual bond assessments violates the provisions of the Commonwealth Documents Law, 45 P.S. §1102-1208. The appellants argue that the documents relied on by DER are of general application and future effect and, therefore, are subject to the regulatory enactment procedures.

There is a recognized distinction between administrative actions which impose substantive rules and are therefore legislative in nature and those which merely interpret existing rules and regulations. Legislative rules must be promulgated through rule-making procedures, while interpretative rules need not comply with such procedures. *Pennsylvania Human Relations Commission v. Norristown Area School District,* 473 Pa. 334, 374 A.2d 671 (1977).

Section 505(e) of the SWMA delegates to the Secretary of DER the authority to require "additional bond assessments if the department determines that such additional amounts are necessary to guarantee compliance with this Act." DER, in turn, developed two documents, a bond table and a bond matrix which

it uses to determine the amounts of the bonds required of each transporter of hazardous waste. The bond table differentiates between transporters of hazardous waste which carry more than 10,000 tons per year and those which carry less than 10,000 tons annually, while the bond matrix distinguishes between the types of hazardous waste being transported (*e.g.* ignitable, corrosive, reactive, E.P. toxic, acute hazardous and toxic) and the physical state of the waste (*e.g.* liquid, solid or gas). Although the primary bond amount determined by reference to these documents will, at least initially, apply to all transporters of hazardous waste carrying the same volume, type and form of waste, exceptions, deviations, and exemptions to the bond assessments are available to individual transporters. The Secretary of DER, for example, may adjust a preliminary assessment, either up or down, depending upon the compliance history of the individual applicant.

In *Norristown Area School District,* the Pennsylvania Supreme Court reviewed documents developed by the Human Relations Commission which established a percentage scale for use in determining whether a particular school would be subject to a desegregation enforcement action. The scale required a comparison of the percentage of minority students in any given school in proportion to the number of minority students in the school district. The documents were held to be interpretative, not legislative, so that the Commission was not required to comply with the provisions of the Commonwealth Documents Law:

> [The documents have] never been considered, by the Commission or the courts to be rigid, hard and fast legislative regulation[s]. The use of [the 30% range] the limits of which were . . . flexible and capable of extension, appeared both in theory and eventually in practice, to be the

best method to carry out a flexible case-by-case approach to school [d]esegregation.

473 Pa. at 341 n.13, 374 A.2d at 675 n.13 (quoting *Pennsylvania Human Relations Commission v. Norristown Area School District,* 20 Pa. Commonwealth Ct. 555, 560, 342 A.2d 464, 467 (1975)).

DER's matrix and tables do not constitute hard and fast standards which transporters must meet in order to secure a license to transport hazardous waste. The documents were specifically designed to implement Section 505(e) of the SWMA and, as such, merely provide a method of carrying out the requirement of the statute.

For these reasons we affirm the order below.

ORDER

AND Now, this 22nd day of August, 1985, the order of the Environmental Hearing Board in the above-captioned matter is affirmed.